## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                           Case No. 24-cr-71 (JRT/ECW)

      Plaintiff,

   v.                                              **REPORT AND RECOMMENDATION**

James Edward Stucky,

      Defendant.

This matter is before the Court on Defendant James Edward Stucky's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 29); Defendant James Edward Stucky's Motion to Suppress Statements, Admissions and Answers (Dkt. 30); Defendant James Edward Stucky's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 31); and Defendant James Edward Stucky's Motion and Memorandum to Suppress All Evidence Obtained from the Search of [XX] Acker Street E. and [XXX] Charles Avenue Apartment [XXXX] (Dkt. 42). The Court refers to these addresses as the "Acker Street Property" and "Charles Avenue Residence," respectively.

This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

On May 13, 2024, Defendant filed through counsel boilerplate motions to suppress any physical evidence obtained as a result of a search and seizure; to suppress statements; and to suppress evidence obtained via electronic surveillance. (Dkts. 29-31.) On May

30, 2024, the Government filed its response to the Motions, asserting that after conferring with Stucky's counsel, it was the Government's belief that the motions to suppress statements and evidence resulting from electronic surveillance were filed in an abundance of caution and did not identify any statements and/or interceptions subject to suppression. (Dkt. 38 at 1.)  The Government also noted that Stucky's motion to suppress failed to detail the specific facts and circumstances supporting suppression.  (*Id.* at 4.)

On the same day, the Government filed its notice of intent not to call any witnesses and requested on behalf of both parties that the hearing on Defendant's Motions be stricken and the suppression motions be decided on the written submissions. (Dkt. 39.)

On May 31, 20124, the Court issued an Order canceling the hearing, but requiring Defendant to file a memorandum of law that complied with paragraph 17 of the Case Management Order (Dkt. 13) in support of his pending suppression motions on or before June 7, 2024.  (Dkt. 40.)  Defendant filed a supporting memorandum as a part of second motion to suppress evidence (Dkt. 42) and on June 14, 2024, the Government filed its response (Dkt. 44), making this case ripe for decision.

## I.    FACTUAL BACKGROUND

Defendant James Edward Stucky ("Defendant" or "Stucky") is charged by Indictment with one count of possession with intent to distribute Methamphetamine, Fentanyl, and Cocaine in violation of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(B), where the count is related to the Acker Street Property; one count of Felon In Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); one count of Possessing a

Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C.

§ 924(c)(1)(A); one count of Possession with Intent to Distribute Methamphetamine in

violation of §§ 841(a)(1), and 841(b)(1)(B), where the count is related to the Charles

Avenue Residence; and one count of Possession with Intent to Distribute

Methamphetamine, Fentanyl and Cocaine found on his person in violation of 18 U.S.C.

§§ 841(a)(1), and 841(b)(1)(C).  (Dkt. 1.)

Stucky seeks to suppress evidence seized as the result of the following search

warrants:

> (1)    Search Warrant for XX Acker Street E., Saint Paul, Minnesota - a
> secure lot with two buildings and multiple vehicles on site ("Acker
> Street Property"), issued on November 29, 2023, at 11:51 a.m.
> (Gov't Ex. 1); and
>
> (2)    Search Warrant for XXX Charles Avenue, Apartment XXXX, Saint
> Paul, Minnesota, ("Charles Avenue Residence") issued on
> November 29, 2023, at 12:58 p.m.  (Gov't Ex. 2.)

(Dkt. 42.)

Stucky argues that there was insufficient probable cause for the issuance of the

Acker Street Property warrant because the search warrant application does not establish a

nexus between evidence of a crime and the Acker Street Property.  (Dkt. 42 at 2.)

Specifically, Stucky asserts that the supporting application contains "a lot of irrelevant

facts" including information regarding the Charles Avenue Residence, and that the only

connection to narcotics involved a single incident where he was seen leaving the address,

selling controlled substances to a CRI, and then coming back to the address.  (*Id.* at 3-4.)

According to Stucky, this incident does not provide a sufficient nexus because it lacks

any knowledge that Stucky picked up the controlled substances at the Acker Street Property or went back to the property with controlled substances. (*Id.* at 4.) Stucky also makes an overbreadth and lack of particularity argument with respect to the automobiles searched at the Acker Street Property, asserting that the supporting application does not describe the vehicles and does not link the vehicles searched to the commission of a crime. (*Id.* at 8-9.)

With respect to the application for the Charles Avenue Residence, the asserted basis for suppression of evidence seized, as will be discussed more fully below, is that the supporting application fails to articulate a substantial basis to conclude evidence of a crime would be found at the Charles Avenue Residence, the search warrant is based on stale information, the ION swab taken of the door to the apartment is unreliable, the warrant did not provide anything regarding its reliability, and that it could be based on "junk science." (*Id.* at 11-13.) Stucky also contends that probable cause is somehow lacking as to both search warrants because they are largely based on the same facts, which evidences how few facts there were to support their issuance. (*Id.* at 14-15.)

The Government counters that the search warrants are supported by sufficient probable cause and that even if probable cause supporting the search warrants is found lacking on subsequent review, the evidence seized is still not subject to suppression because the officers' reliance on the search warrants was reasonable for the purposes of the exception set forth by *United States v. Leon*, 468 U.S. 897 (1984). (Dkt. 44.)

The Court will proceed with addressing each of the search warrants.

## II.    LEGAL STANDARD

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit.  *See Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238).  The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

"Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231).  In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed.  *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge.").  "Judges may draw reasonable

inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant . . . .'"  *See United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009), quoting *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)).

As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'"  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

The proponent of a suppression motion on the basis of a Fourth Amendment violation bears "the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

### III.   ANALYSIS

#### A.   Search Warrant for the Acker Street Property (Gov't Ex. 1)

On November 29, 2023, Investigator Jeremiah Jessen with the Hennepin County Sheriff's Office applied for a search warrant for the Acker Street Property described as a "secure lot with two buildings and multiple vehicles on site."  (Dkt. 44-1 (Gov't Ex. 1) at 3.)  The application for the search warrant sought a number of items, including:

controlled substances, including but not limited to methamphetamine and fentanyl; paraphernalia and instrumentalities pertaining to drug distribution; currency; records; and firearms.  (*Id.* at 3.)

The basis for the issuance of the search warrant included the following:

- Investigator Jessen had received information from a Confidential Reliable Informant ("CRI") regarding a black male selling large quantities of methamphetamine.  The CRI had provided corroborated information in the past resulting in the issuance of search warrants leading to the seizure of narcotics, weapons, currency, and numerous arrests.  Based on this, the CRI was deemed reliable.

- Within the previous three months from the date of search warrant application, Investigator Jessen received information from the CRI regarding the black male selling quantities of methamphetamine, fentanyl, cocaine, and marijuana. According to the CRI, this individual was driving a maroon H2 Hummer bearing MN plate [XXXXXX]. Investigator Jessen checked the Department of Vehicle Services ("DVS") web page and found that this vehicle was registered to James Edward Stucky.

- After retrieving a photograph of Stucky from the DMV, Investigator Jessen showed it to CRI who identified the person in the photograph as the person they knew who sold quantities of methamphetamine.

- Within two months prior to the date of search warrant application, the CRI arranged for the controlled buy.  During the controlled buy, Investigator Jessen and other law enforcement officers had the CRI under surveillance, which had been searched, along with their vehicle.  Officers observed a maroon H2 Hummer bearing MN plate [XXXXXX] arrive at the predetermined buy location, observed the CRI and driver of the H2 Hummer meet, and observed the H2 Hummer drive away.

- After the controlled buy, additional investigators kept the H2 Hummer under constant visual surveillance and followed it to the Charles Avenue apartments.

- After the controlled buy, at a predetermined meet location, CRI provided the affiant with what appeared to be crystal methamphetamine, which later field tested positive for methamphetamine.

- Investigator Jessen contacted the Hennepin County Sherriff's Office / Criminal Intelligence Division / Criminal Information Sharing and Analysis and requested information on Stucky. Investigator Jessen learned that Stucky was a registered sex offender with a primary address of XXXX Minnehaha Avenue E., St. Paul; that he had two vehicles listed on the registry of a black Hummer H2 bearing Minnesota plate [XXXXXX] and a white Chevrolet Blazer bearing Minnesota plate [XXXXXX].

- Stucky had a phone number on his registry, which based on law enforcement databases listed to Stucky under the name of the "Neighborhood Hauling and Handyman Services L.L.C." with the same address as the Acker Street Property. Stucky is listed as the registered agent on file and contact for Neighborhood Hauling and Handyman Services L.L.C.

- Investigator Jessen and other officers conducted surveillance at the Acker Street Property for two months prior to the application, and observed Stucky coming to and leaving the Acker Street Property driving his black Hummer H2 bearing the license plate identified in the registry, as well as multiple other vehicles. This vehicle had also been seen multiple times at the parking lot of the Charles Avenue Residence, including being left overnight on multiple occasions.

- Stucky bought and sold vehicles, which gave him access to multiple vehicles to utilize. The Acker Street Property was a gated dirt parking lot with two outbuildings. Electronic databases showed that the taxpayer for this property as African Christian Fellowship of MN, Inc.

- Stucky's driving record showed eight vehicles, including a 2010 Ford Escape bearing Minnesota plate [XXXXXX] listed to him. Investigator Jessen ran the plate for this vehicle and discovered that it registered to Tasia Toombs ("Toombs") with a home address listed as the Charles Avenue Residence. The vehicle also had a previous address listed as XXXX Minnehaha Avenue in Saint Paul, which was Stucky's address listed in his driver's record and the sex offender registry.

- On November 1, 2023, law enforcement conducted an undercover investigation around the Charles Avenue Residence in Saint Paul and observed Stucky and a female identified as Toombs walking out of the apartment complex at that address. Stucky and Toombs were seen driving away in a black GMC Terrain bearing Minnesota plate [XXXXXX] out of the parking lot at the apartment complex. Law enforcement had seen Stucky driving this vehicle on multiple occasions.

- On November 2, 2023, Investigator Jessen went in the early morning to the Charles Avenue apartments and observed the black GMC Terrain bearing Minnesota plate [XXXXXX]. Investigator Jessen noted the vehicle was frost covered due to the cold weather, and had not been driven for hours. Investigator Jessen believed that the vehicle had been parked overnight in the lot and also noted that the vehicle was parked next to the 2010 Ford Escape bearing Minnesota plate [XXXXXX].

- Stucky was observed driving the black GMC Terrain on multiple occasions and the vehicle was seen in the parking lot of the apartments of the Charles Avenue Residence. This vehicle was not registered to Stucky or Toombs. Based on Investigator Jessen's experience and training, individuals conducting criminal activities will often switch vehicles and drive vehicles not listed to them.

- Based on police records, Toombs had a police complaint in March 1, 2023 against Stucky for placing a tracker in her vehicle. Investigator Jessen believed that Stucky and Toombs were in a romantic relationship and lived together at the Charles Avenue Residence.

- 72 hours prior to the warrant application, Investigator Jessen, with the assistance of a CRI, arranged for the controlled buy of fentanyl from Stucky. Investigator Jessen met with the CRI, who searched the CRI and their vehicle for contraband, none of which was located. Investigator Jessen provided the CRI with a predetermined amount of currency to purchase fentanyl from Stucky.

- Officers then observed who they believed was Stucky at the Acker Street Property and then observed the black GMC Terrain bearing Minnesota plate [XXXXXX] leave the property and travel to the predetermined buy location. Officers observed that the occupant of the vehicle then met with the CRI, and then the officers watched the black GMC Terrain leave shortly thereafter and followed the vehicle directly back to the Acker Street Property. The vehicle drove through the secured gate into the parking lot.

- The CRI, who was under constant surveillance, then met up with law enforcement and told them that he had purchased fentanyl from Stucky and that Stucky was driving the vehicle bearing the Minnesota plate associated with the black GMC Terrain. The suspected fentanyl purchased by the CRI field tested positive for fentanyl.

(Gov't Ex. 1, Dkt. 44-1 at 4-8.)

On November 29, 2023, Ramsey County District Judge Maria Mitchell issued the search warrant for the Acker Street Property with two buildings and multiple vehicles on site. (*Id.* at 11-12.)

The Court finds that the supporting application contains sufficient supporting information to establish probable cause that Stucky engaged in narcotics-related activity during the relevant period. Indeed, Stucky does not deny this as part of his Motion to Suppress. First, Investigator Jessen provided detailed statements about Stucky's narcotics trafficking, including information from an established CRI describing Stucky's involvement in narcotics trafficking. Law enforcement then corroborated the CRI's information through two controlled buys (under law enforcement surveillance) over a two-month period, including one 72 hours prior to the warrant application, yielding methamphetamine and fentanyl. *See United States v. Randle*, No. CR 19-50 ADM/TNL, 2020 WL 1685843, at *6 (D. Minn. Apr. 7, 2020), ("[T]he reliable CRI's tip, corroborated by the controlled buy, was sufficient to establish probable cause to believe Randle was trafficking drugs."), *aff'd*, 39 F.4th 533 (8th Cir. 2022) (citation omitted). As such, the Court finds that probable cause existed to believe that Stucky was trafficking narcotics as of the date of the issuance of the search warrant for the Acker Street Property.

The focus of Stucky's argument is that the majority of the search warrant application lacks the requisite information connecting the Acker Street Property to narcotics activity, as it adds a "bunch of useless facts" to make it appear Stucky had controlled substances at the property. (Dkt. 42 at 4-5.) However, along with the

evidence of drug trafficking, the application contained information that Stucky provided a

telephone for the purposes of the sex offender registry listed to the Acker Street Property

and that he was the agent of a company that listed its address as the Acker Street

Property.  Further, the application states that officers had conducted surveillance at the

Acker Street Property for two months and observed Stucky coming to and leaving the

Acker Street Property driving his Hummer H2 bearing MN Plate [XXXXXX], as well as

multiple other vehicles during this time.  This information, coupled with the fact that law

enforcement observed Stucky drive from the Acker Street Property to the predetermined

location of the controlled buy and then drive directly back to the Acker Street Property

after the completion of controlled buy, only 72 hours prior to the application, provided a

sufficient nexus between the property and drug trafficking activity.  *See O'Neil v. United

States*, 966 F.3d 764, 772 (8th Cir. 2020) ("Further, although the seller was not seen

coming from the identified apartment, it appears that the magistrate judge found that her

entry into that apartment after the sale made it probable that evidence of criminal activity

was within.  Given the deference owed to the magistrate judge, we affirm that

conclusion.").

        The Court notes that Stucky also takes issue with the fact that the application does

not address several possibilities, including: whether the African Christian Fellowship of

MN Inc., which is the property listed as the taxpayer for the Acker Street Property,

operates out of the address; whether Stucky worked at the address; whether he rents or

leases the address; whether there are other people coming and going at the address;

whether Stucky carried anything into or out of the property; and how much time he spent

at the property. (Dkt. 42 at 5-6.) However, "probable cause does not require [officers] to rule out a suspect's innocent explanation for suspicious facts." *United States v. Meyer*, 19 F.4th 1028, 1032 (8th Cir. 2021) (citation and marks omitted); *see also United States v. Perry*, 908 F.3d 1126, 1129-30 (8th Cir. 2018) ("[Defendant's] possible innocent explanation did not require the officers to disregard other, less innocent possibilities or to ignore the other circumstances indicating guilt.") (citation omitted).

Stucky further challenges the search warrant on the basis that the warrant lacked sufficient particularity and was overbroad, as it failed to identify with specificity all of the vehicles subject to search, and there was no nexus between controlled substances and the vehicles. (Dkt. 42 at 8-9.) The Court rejects this argument. The Fourth Amendment provides that "no Warrants shall issue . . . [unless] **particularly describing** the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The Fourth Amendment's particularity requirement avoids "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." *United States v. Gitcho*, 601 F.2d 369, 372 (8th Cir. 1979); *see also United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988). The "Fourth Amendment requires

particularity in the warrant, not supporting documents like an application or affidavit."
*United States v. Sigillito*, 759 F.3d 913, 923-24 (8th Cir. 2014).

Courts judge compliance with the particularity requirement according to "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted). "How specific a warrant must be varies "depending on the circumstances and the type of items involved." *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (internal quotations omitted). As such, courts do not resolve issues concerning particularity "in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (internal quotation marks omitted).

Although courts sometimes treat particularity and breadth synonymously, *see, e.g.*, *Kiesling v. Holladay*, 859 F.3d 529, 537 (8th Cir. 2017) ("The Fourth Amendment's particularity requirement commands that an overbroad warrant is not saved if probable cause is lacking for only some, but not all, of the items to be searched."), technically speaking, particularity and breadth of a warrant are separate issues, *see In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991) ("Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.") (citation omitted); *United States v. Adams*, No. 17-cr-64 (DWF/KMM), Dkt. No. 221 (D. Minn. Sept. 17, 2018), *R. & R. adopted*, 2018 WL 6445547 (D. Minn. Dec. 10, 2018); *see also United States v. Brown*, No. 19-CR-110

13

(ADM/ECW), 2019 WL 7838276, at *11 (D. Minn. Sept. 20, 2019), *R. & R. adopted*,

2019 WL 6607240 (D. Minn. Dec. 5, 2019).

Here, the search warrant described the premises to search as: "[A] secure lot with

two buildings and multiple vehicles on site.  The address is secured by a fence and a

secure gate at the entrance of the property."  The Court finds that this description is

sufficiently particular, as it informs officers that they can only search vehicles that are

secured within the fence and gate of the Acker Street Property.  Moreover, the application

set forth that Stucky generally drove a number of different vehicles, including vehicles

that came to and left the Acker Street Property, that he bought and sold vehicles, that he

was the registered agent of a business with an address listed as the Acker Street Property,

that based on Investigator Jessen's experience and training, individuals conducting

criminal activities will often switch vehicles and drive vehicles not listed to them, and

that Stucky's narcotics activities listed in the application were facilitated through multiple

motor vehicles.  The Court finds that the totality of this evidence provides a sufficient

nexus between the vehicles on the Acker Street Property and narcotics trafficking.  *See*

*United States v. Carrillo-Diaz*, 361 F. App'x 707, 709 (8th Cir. 2010) ("Carrillo-Diaz

argues the warrant should have been limited to searches of vehicles owned by her

parents.  This argument is without merit.  The affidavit supporting the warrant

demonstrated that much—if not all—of the drug trafficking activity involving motor

vehicles did not involve vehicles owned by Juan or Lucia Carrillo-Diaz.  In light of this

fact, it was reasonable for the government to seek a warrant not limited to vehicles owned

by Juan or Lucia Carrillo-Diaz.  In addition, the warrant was limited in scope by limiting

14

searches only to vehicles parked on the property.  We hold the district court did not err by suppressing [sic] the evidence on the grounds the warrant was facially overbroad.") (affirming denial of suppression motion).

For the reasons stated above, the motions to suppress the evidence seized at the Acker Street Property (Dkts. 29 and 42), including from the vehicles on the property, should be denied.

## B.     Search Warrant for Charles Avenue Residence (Gov't Ex. 2)

On November 29, 2023, Investigator Jessen also applied for a search warrant pertaining to the Charles Avenue Residence.  (Dkt. 44-2 (Gov't Ex. 2).)  The application sought a search warrant for a number of items, including: controlled substances, including but not limited to methamphetamine, cocaine, and fentanyl; paraphernalia and instrumentalities pertaining to drug distribution; items to show constructive possession of the same; currency; ledger receipts; and vehicles associated with occupants of the apartment at the time of the warrant.  (*Id.* at 2.)

The basis for the issuance of the search warrant was largely the same as the Acker Street Property warrant, with the following additional information regarding the Charles Avenue Residence:

- On 11/29/23, Investigator Jessen and Detective Zilles of the West Metro Drug Task Force went to the Charles Avenue apartment complex, gained access through an unsecured entrance door, and conducted an ION swab of the outer door handle of the Charles Avenue Residence.

- The swab was taken to the MN National Guard Counter Drug Unit in the City of St. Paul and Sergeant Getz, who is certified and trained in the operation of the

ION scan device, tested the ION swab, which alarmed for and indicated the presence of 11% cocaine.

- Investigator Jessen knew from training and experience that individuals who sell narcotics will often keep their illegal narcotics and profits from their sales in separate locations in order to avoid detection by law enforcement. He also knew that individuals who sell narcotics will often live at a location that is not registered to them and that Stucky has a listed address that is different than where he was staying overnight. Based on both physical and electronic surveillance, law enforcement knew that that Stucky was living at the Charles Avenue Residence.

(Gov't Ex. 2, Dkt. 44-2 at 3-8.)

On November 29, 2023, Ramsey County District Judge Elena Ostby issued the search warrant for the Charles Avenue Residence. (*Id.* at 10-12.)

For the reasons stated as to the Acker Street Property Search warrant, *supra*, the Court finds that the supporting application as to the Charles Avenue Residence contains sufficient supporting information to establish probable cause that Stucky engaged in narcotics-related activity during the relevant period, including the CRI's controlled buy 72 hours before the issuance of the search warrant. Moreover, the Application sets forth sufficient facts from which the issuing judge could find that Stucky resided at the Charles Avenue Residence. This includes evidence that: Stucky travelled to the apartment complex where the Charles Avenue Residence is located after a controlled buy of narcotics with the CRI two months prior to the application; he was in a relationship with someone who listed the Charles Avenue Residence as her residence; his vehicles were seen at the parking lot of the Charles Avenue Residence; Stucky was seen multiple times walking in and out of the apartment complex where the Charles Avenue Residence is located and seen at the parking lot of the apartment complex; and officers spotted

Stucky's vehicle parked overnight at the Charles Avenue apartment complex on November 1 and 2, 2023, the same month that the warrant issued.

Stucky argues that even if the Court finds that the search warrant for Charles Avenue Residence contains sufficient information connecting him to the apartment, the application lacks sufficient evidence of a nexus between the apartment and criminal activity. (Dkt. 42 at 12-14.) According to Stucky, the only such evidence is the fact that officers observed him going to the Charles Avenue Residence two months earlier after a controlled buy with the CRI, which he asserts constitutes stale evidence and does not include any evidence of him bringing anything to the apartment; and the ION scan of the door handle of the Charles Avenue Residence showing the presence of cocaine, which he claims is unreliable, because it is based on "junk science" and subject to false positives resulting from other persons (not Stucky) entering the apartment or the result of other innocent substances that mimic cocaine. (Dkt. 42 at 12-13.) Stucky argues that the application did not address the reliability of this test. (*Id.* at 12.)

"A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. C-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up). "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (cleaned up). Indeed, "in investigations of ongoing narcotics operations,

intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up).

As set forth previously, the application for the Charles Avenue Residence contains the following facts: a CRI's information that Stucky was engaged in narcotics trafficking; that Stucky was seen engaging in a controlled buy with the CRI, two months prior to the application, where he was seen going to the apartment complex that included the Charles Avenue Residence; and that Stucky engaged in a second controlled buy with the CRI only 72 hours prior to the application for the warrant (albeit connected to the Acker Street Property by surveillance). The application also contained Investigator Jessen's representations that, based on his training and experience, individuals who sell narcotics will often keep their illegal narcotics and profits from their sales in separate locations in order to avoid detection by law enforcement and live in places not registered to them; and that an ION scan of the door knob of the entrance into the Charles Avenue Residence tested positive for cocaine on the day of the application. Based on the evidence of an ongoing narcotics trafficking, along with the positive ION scan,[1] the Court does not find the information supporting the issuance of the search warrant to be stale and finds that the

---

[1]    The Court also rejects any argument by Stucky that the fact that law enforcement conducted the ION test on the Charles Avenue Residence just before Investigator Jessen sought the warrants and the overlap of facts between the applications (Dkt. 22 at 14-16) undermine the existence of probable cause existed for the warrants' issuance. Stucky has not asserted that the affiant made any misrepresentations, and, as explained above, the issuing court had a substantial basis for concluding that probable cause existed for each warrant based on the totality of circumstances.

information established a fair probability, based on the totality of the circumstances, that evidence of drug trafficking would be located in the residence. *See United States v. Kline*, No. CR 17-253 (MJD/BRT), 2018 WL 1278315, at *3 (D. Minn. Feb. 23, 2018) ("In addition to Defendant being seen in the possession of drugs and large amounts of cash in recent months, Officer Lepinski conducted an "Ion Scan" swab on Defendant's door handle 72 hours before applying for the search warrant, which tested positive for the presence of cocaine. This information suggests that the drug enterprise was still ongoing, and as a result, establishes a "fair probability" that evidence of drug trafficking would be found in Defendant's apartment.") (internal citation omitted), *R. & R. adopted*, 2018 WL 1277001 (D. Minn. Mar. 12, 2018).

While Stucky challenges the application's reliance on the ION scan, the use of an ION scan to test for narcotics has been discussed by the Eighth Circuit as far back as 2009, when it mentioned the use of an ION scan test to detect the presence of drugs on the exterior surface of a bag, the results of which were later used to secure a search warrant for the bag and the defendant's person. *See United States v. Carter*, No. 020CR00035 MJDKMM, 2020 WL 6136480, at *6 (D. Minn. Sept. 18, 2020), *R. & R. adopted*, 2020 WL 6135901 (D. Minn. Oct. 19, 2020) (citing *United States v. Alvarez-Manzo*, 570 F.3d 1070, 1073-74 (8th Cir. 2009)). Courts have concluded that ION scans are "widely used" law enforcement tools that have a recognized ability to detect narcotics. *See Braun v. Maynard*, 652 F.3d 557, 561 (4th Cir. 2011) ("[T]here was no reason for the searching officers to believe that the Ionscan could not reach this threshold. Both sides accept the fact that a properly deployed, properly functioning Ionscan device

can detect drugs and other chemicals.  In keeping with this recognized capability, ion scanning machines have been widely used[.] . . . Finally, though the case law on [this] point is particularly sparse, several courts have found Ionscan evidence reliable enough.") (citations omitted).  Courts within this District have relied on ION scans as part of the probable cause determination for the issuance of search warrants related to residences.  *See*, *e.g.*, *United States v. Branch*, No. CR 22-178 (SRN/DTS), 2023 WL 3170435, at *10 (D. Minn. May 1, 2023) (finding that "the positive ion scan adds weight to a finding of probable cause" for the issuance of search warrant for an apartment) (collecting cases); *United States v. Reed*, No. 17-cr-253 (MJD/BRT), 2018 WL 4233836, at *6 (D. Minn. July 11, 2018) (noting that a confidential informant's tip was corroborated by a positive ion scan swab, among other factors), *R. & R. adopted*, 2018 WL 4232999 (D. Minn. Sept. 5, 2018).  The fact the application does not address the reliability of the ION scan does not vitiate probable cause given that it corroborates other evidence connecting the Charles Street Residence to narcotics trafficking and is not the sole basis for the issuance of the search warrant.  *See Branch*, 2023 WL 3170435, at *10 ("If the positive ion scan results here had served as the sole basis for probable cause, Branch's argument would carry greater weight.  However, under the totality of the circumstances, the CRI's information and the officers' corroboration of Branch's address and criminal history also contributed to a showing of probable cause sufficient to search Branch's apartment."); *Carter*, 2020 WL 6136480, at *9 ("The ion scan test on a sample swabbed to the door has more in common with a field-test for drugs, a positive result from which is generally considered to support a finding of probable cause without any specific showing regarding

its reliability. . . .  Although here the results of the ion swab are more central to the probable-cause showing . . . , the positive tests from the sample corroborated the concerned citizen's tip that Mr. Carter was involved in the sale of illegal drugs.") (citation omitted); *Reed*, 2018 WL 4233836, at *6 n.4 (rejecting that the absence of information regarding the reliability of ION scan affected the overall finding of probable cause as scan constituted a single piece of evidence offered to corroborate information provided by two separate informants).  The Court therefore recommends against suppression of the evidence seized as a result of the Charles Avenue Residence warrant.

* * *

For the reasons stated above, the Court recommends that the Motions to Suppress evidence seized from the Acker Street Property and the Charles Avenue Residence (Dkts. 29 and 42) be denied because the warrants are supported by sufficient probable cause for Fourth Amendment purposes.

## C.    *Leon* Exception

Because the search warrants for the Acker Street Property and the Charles Avenue Residence were supported by probable cause (as set forth above), this Court need not determine whether the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should apply.  The Court notes, however, that even if the warrants were deficient, the officers' reliance on the warrants would have been reasonable under *Leon*.

Under *Leon*, "evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[ ] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable."  *United States v. Houston*, 665

F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). In *Leon*, the court stated that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate [judge] normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" 468 U.S. at 922 (citations omitted). However, the *Leon* court noted that there are certain instances when "the purpose of the exclusionary rule— deterring police misconduct—will not be served by suppressing illegally seized evidence." *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23. "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search." *Martin*, 833 F.2d at 755. The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge]'s authorization." *Leon*, 468 U.S. at 923 n.23. In addition, "even if the information in the warrant affidavit was impermissibly stale, the warrant was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." *United States v. McNeil*, 184 F.3d 770, 775 (8th Cir. 1999) (citations omitted). The Eighth Circuit has also found the *Leon* exception may apply to warrants that are insufficiently particular or overbroad. *See, e.g.*, *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); *United States v. Curry*, 911 F.2d 72, 77-78 (8th Cir. 1990) ("[T]he *Leon* exception is not

automatically inapplicable in every case where a warrant is found invalid on the ground that it is insufficiently particular.").

However, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

    i.    when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

    ii.    when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

    iii.    when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

    iv.    when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431). With respect to the third exception, the Eighth Circuit has explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." *Proell*, 485 F.3d at 432 (quoting *Carpenter*, 341 F.3d at 670).

Here, the Court does not find that the applications were intentionally or recklessly misleading, or that the issuing judges wholly abandoned their judicial role in issuing the search warrants. As to the remaining exceptions, the Court has already concluded that the affidavits provided an adequate factual basis for the issuing judges to have found probable cause. Therefore, based on all the facts and circumstances of this case, it was

not "entirely unreasonable" for law enforcement officers to rely on state district judges' issuance of the search warrants at issue.

This provides an independent basis for recommending denial of Stucky's Motions to Suppress physical evidence obtained from the Acker Street Property and the Charles Avenue Residence (Dkts. 29 and 42).

**D.    Motions to Suppress Statements and Electronic Surveillance Evidence (Dkts. 30 and 31)**

As stated previously, the Government asserted in its initial response to Stucky's suppression motions relating to statements and evidence from electric surveillance (Dkts. 30 and 31) that, after conferring with Stucky's counsel, the Government believed that Stucky filed those two motions in the abundance of caution.  (Dkt. 38 at 1.)  The Government further stated that Stucky did not identify any statements and/or interceptions subject to suppression.  (*Id.*)  The Court gave Stucky the opportunity to provide supplemental briefing as to these Motions (Dkt. 40), but Stucky did not file any additional briefing.  As such, the Court recommends denial of the Motions (Dkts. 30 and 31) as moot, as no specific statement or other evidence has been identified by Stucky for suppression and it appears he is no longer pursuing suppression on those grounds.

## IV.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendant James Edward Stucky's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 29) be **DENIED;**

2.       Defendant James Edward Stucky's Motion to Suppress Statements, Admissions and Answers (Dkt. 30) be **DENIED** as moot;

3.       Defendant James Edward Stucky's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 31) be **DENIED** as moot; and

4.       Defendant James Edward Stucky's Motion and Memorandum to Suppress All Evidence Obtained from the Search of [XX] Acker Street E. and [XXX] Charles Avenue Apartment [XXXX] (Dkt. 42) be **DENIED**.


DATED: July 15, 2024                         *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).